# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DOUGLASS S MEAD III | : | |
| | : | |
| Plaintiff | : | |
| | : | C.A. |
| Vs. | : | |
| | : | |
| CHETAN MISHRA | : | |
| RHIZOME AI, INC. | : | |

## COMPLAINT & JURY TRIAL DEMAND

Douglass Mead ("Plaintiff"), by and through its undersigned counsel, submits this Complaint and Jury Trial against Chetan Mishra ("Mishra") and a closely held company, Rhizome AI Inc. ("RAI" or "Rhizome"; together with Mishra referred to as "Defendants").

## SUMMARY OF THE ACTION

1. Plaintiff initiates this lawsuit against the Defendants for breaching an agreement to issue 50% of the issued and outstanding shares of RAI to the Plaintiff.

2. RAI had initially been organized by Mishra regulatory intelligence AI search tool, which had been developed for the medical device industry.

3. However, until May of 2024 neither RAI nor Mishra were actively marketing or developing business and the company was for all intents and purposes dormant.

4. Then Plaintiff became involved with the Defendants Plaintiff brought the exact experience and industry credibility necessary for RAI to develop business. Plaintiff has served as CP Pathways' principal consultant, a company providing regulatory guidance and support to companies in the pharmaceutical industry. He is a recognized regulatory expert with a diverse

background in drugs and devices, including their design and testing, risk analysis, human factors testing, stability testing, and clinical trial real use patient handling assessments. During the course of his career the Plaintiff has, among other things, served as:

- Senior Director, Global Regulatory Affairs, Medical Devices and Combination Products, for Johnson and Johnson's Janssen Research & Development LLC, and was responsible for establishing and implementing the worldwide regulatory strategy for the development of drug delivery systems and drug-device combination products.

- Regulatory Specialist at the law firm of Hogan and Hartson (now Hogan Lovells LLP) in their medical device practice where he was responsible for the preparation of regulatory filings for client medical device companies.

- Director of Regulatory Affairs at Elan Drug Delivery, Inc., where he served as an executive for a business unit that developed sophisticated disposable devices for auto-injection and patch pumps with licensee pharmaceutical partners for commercialization as combination products.

5. In exchange for a 50% stake in the business Plaintiff brought to bear his considerable skills to advance RAI's interests. From May 2024 through August 2025 Plaintiff's contributions were essential to developing a functional, market-ready product and generating commercial traction. Plaintiff's efforts included, among other things:

(a) Product Co-Development and Algorithm Refinement.
(b) Development of Validation Database.
(c) Regulatory Expertise and Industry Education.
(d) Marketing Materials and Customer Support.
(e) Industry Demonstrations and Commercial Launch.
(f) Sales and Business Development.
(g) Professional Marketing and Thought Leadership.

6, However, once RAI began to gain a foothold in the market, Mishra reneged on the parties Agreement, misappropriated hundreds of thousands of dollars or the Plaintiff's work

product, trade secrets and decades of client contacts he exclusively developed in connecting with his business. Worse, Mishra and RAI have presented Plaintiff's proprietary information and work product as their own and solicited investors and clients by making a series of deliberately false representations. As a result, Plaintiff seeks damages, injunctive relief and such other relief as the Court deems just and proper.

**THE PARTIES**

7. Plaintiff Douglass Mead ("Plaintiff") is a resident of the Commonwealth of Pennsylvania, residing at 6 Buck Lane, Haverford, Pennsylvania 19041.

8. Defendant Chetan Mishra ("Mishra") is an individual residing at 136 Oakland Ave., Apt. 4N, Jersey City, New Jersey 07306.

9. Defendant Rhizome AI, Inc. ("Rhizome") is a Delaware corporation formed in or about January 2023. Upon information and belief, its principal place of business is in Jersey City, New Jersey, and Mishra is its founder, chief executive, and controlling stockholder.

**JURISDICTION AND VENUE**

10. This district court has original jurisdiction pursuant to 28 USC §1332 as the amount in controversy exceeds the sum $75,000, exclusive of interest and costs, and is between citizens of different States. Further, this Court has exclusive jurisdiction over the claims filed by the Plaintiff pursuant to Section 10(b) of the Securities and Exchange Act of 1934 and SEC Rule 10b-5.

11. Pursuant to 28 USC §1391 venue is appropriate in this judicial district as a substantial part of the events or omissions giving rise to the claim occurred.

## STATEMENT OF FACTS

A. The Plaintiff and Defendant's Agreement

12. In March 2024, Plaintiff contacted Mishra regarding a proposal to adapt Mishra's existing "Rhizome AI" regulatory intelligence AI search tool, which had been developed for the medical device industry but appeared to no longer be actively marketed.

13. Plaintiff's objective was to transform the Rhizome concept into a GenAI-driven search tool for drug and biologics regulatory intelligence, based on Plaintiff's professional experience in the regulatory consulting and industry network.

14. Mishra represented that the existing Rhizome AI effort had become dormant due to marketing challenges and lack of customers, but that a pivot to the life sciences pharmaceutical market using Plaintiff's concept and contacts could create a viable business opportunity.

15. The parties initially contemplated forming a new company with a new name and equal ownership, but subsequently agreed to retain the existing Rhizome AI corporate structure while repositioning the business to target the pharmaceutical market using Plaintiff's professional contacts, thereby agreeing to an equal 50/50 ownership.

16. Consistent therewith on or about April 6, 2024, Mishra confirmed in writing that he and Plaintiff would own the new business 50/50, with profits to be split equally. Mishra in fact wrote: "Revenue flows to an S-corp, we own it 50/50. We split the profits 50/50." See Exh. A.

17. In reliance on the parties' understanding, Plaintiff performed substantial co-development and marketing services for more than five months before RAI officially launched the search tool.

18. In fact, in reliance on the agreement entered into by Plaintiff and Defendants, Plaintiff spent hundreds of hours co-developing the Rhizome AI search tool to adapt it to the pharmaceutical market, including the use of drug delivery terminology, regulatory requirements and expectations, and topics of highest interest to the target market.

19. From May 2024 through August 2025 Plaintiff provided the following:

*(a) Product Co-Development and Algorithm Refinement.* Beginning in July 2024, Plaintiff extensively tested the Rhizome AI search tool using common regulatory questions based on his regulatory expertise. From July through September 2024, Plaintiff made hundreds of search requests and systematically reported correct and incorrect responses to Mishra, who then revised the search algorithm to provide accurate results. This continued into 2025. The search tool's accuracy and relevance to regulatory queries depended directly on Plaintiff's domain expertise and iterative testing.

*(b) Development of Validation Database.* Plaintiff contributed to the development of a Rhizome AI validation database with tested query responses and a scoring system to measure search performance, accuracy, and relevance.

*(c)Regulatory Expertise and Industry Education.* Plaintiff educated Mishra extensively on drug regulations, current industry challenges, and regulatory precedents that would be of interest in searches for FDA and European Medicines Agency (EMA) drug approval decisions. Plaintiff also identified and prioritized additional international regulatory databases for Rhizome AI to download and integrate. Plaintiff’s efforts were necessary because Mishra lacked background in drug regulatory affairs and knowledge about international regulatory authorities’ expectations for drug delivery device testing, agency interactions, and submission content.

*(d) Marketing Materials and Customer Support.* In October 2024, Plaintiff developed a product brochure explaining the Rhizome AI search tool and its benefits. Plaintiff also developed a comprehensive User's Guide over subsequent months, with frequent updates, to help customers conduct successful searches.

*(e)Industry Demonstrations and Commercial Launch.* In October 2024, the parties attended the AFDO/RAPS Combination Product Summit, a major industry meeting, where they demonstrated the tool over two days to several of Plaintiff’s regulatory contacts. This generated strong commercial interest and multiple follow-up demonstrations. This event validated the market opportunity and launched the Early Access Program (EAP).

*(f) Sales and Business Development.* From December 2024 through July 2025, Plaintiff conducted well over 100 demonstration meetings with pharmaceutical industry regulatory contacts to present the search program. Mishra and Plaintiff

participated in almost all demo meetings to explain the tool's value in conducting precedent research in FDA's approved drug databases. Plaintiff reached out to more than 100 industry contacts during this time via email and LinkedIn messages, with Mishra routinely copied on this correspondence. Essentially all of Rhizome AI's late-2024 and 2025 sales and income originated from Plaintiff's contacts and outreach efforts.

*(g) Professional Marketing and Thought Leadership.* To market the Rhizome AI tool, Plaintiff was interviewed in a pharmaceutical industry podcast ("Let's Combinate") in January 2025; was invited to speak about Rhizome AI at a RAPS Chapter meeting in February 2025; reached out to a conference organizer and was invited to speak about Rhizome AI at the PharmaEd Combination Product Summit in April 2025; and organized a seminar about Rhizome AI through Life Sciences PA in July 2025. Plaintiff was the speaker and was listed as Rhizome AI Co-Founder. These presentations were advertised to over 15,000 individuals, generating significant market exposure.

*(h)* From February through June 2025, Plaintiff prepared 15 regulatory example questions and responses and published them as LinkedIn posts to the regulatory community, generating over 6,000 reads. These posts of highly relevant regulatory reference articles were posted on the Rhizome AI website and continue to be posted, benefiting Rhizome AI's ongoing marketing efforts. (See https://rhizomeai.com/articles )

20. Plaintiff's contributions were not those of a passive investor or sales representative. Plaintiff co-developed the product functionality, created essential marketing and customer materials, educated Mishra on the pharmaceutical regulatory market, leveraged his professional network and reputation to build market presence, and generated substantially all of Rhizome's early customer base and revenue. In fact, Plaintiff drafted an extensive Business Plan for RAI-in which he was listed as a 50% owner. Mishra reviewed the plan and commented thereon but never once challenged the agreement referred to therein.

21. Plaintiff relied on the parties' agreement and Mishra's written assurances of equal co-ownership and equity parity when he undertook the foregoing efforts and therefore devoted substantial time, expertise, and resources—estimated at over 500 hours—to co-developing and marketing the

product without separate compensation. Plaintiff's standard consulting fees at the time were billed at $500.00 per hour.

22. Until Plaintiff joined RAI, Defendants lacked knowledge, information, or access to Plaintiff's customers or his regulatory consulting and industry network. In fact, Plaintiff's client relationships and industry knowledge were confidential in nature and constituted "trade secrets" which were disclosed only when the parties reached an agreement that he would be a 50/50 partner in Rhizome.

23. Consistent with the parties' agreement, on October 19, 2024, Mishra again confirmed that: "Happy to do a 50/50 split here between us" and "We'll cancel and re-issue my equity starting on the same date and subject to the same terms" as Plaintiff's equity, to ensure matching vesting schedules. See Exhibit B.

24. As part and parcel of their agreement, Mishra agreed that Plaintiff would receive 10,000,000 shares under founder equity documentation intended to provide parity with Mishra's own founder shares. These shares and interest in Rhizome AI were intended to serve as a vehicle to achieve a 50-50 partnership rather than to start a new company.

25. In November of 2024 Mishra presented Plaintiff with a Restricted Stock Purchase Agreement (the "SPA") for 10,000,000. However, the SPA failed to include critical and agreed upon terms—referencing matching vesting commencement dates.

B. Mishra's Breaches the Agreement; and Freeze's Plaintiff Out of Rhizome AI\

26. In mid-2025, after the parties had reached an agreement and Plaintiff had performed more than a year of substantial services, Mishra began asserting that the equity split should change.

27. Mishra communicated an intent not to align his own vesting schedule with Plaintiff's vesting schedule, despite his earlier written commitment on October 19, 2024, to "cancel and re-issue" his equity to match Plaintiff's terms.

28. In July 2025, Mishra reached out to Plaintiff via emails and telephone calls to discuss reducing Plaintiff's equity proportion. Mishra suggested that Plaintiff's sales and marketing efforts were insufficient to justify equal ownership, a characterization Plaintiff disputed as factually inaccurate and made in bad faith.

29. On or about August 4, 2025, Plaintiff provided Mishra an edited founder equity agreement consistent with the parties' agreement—including parity as to the parties' vesting schedule.

30. Mishra expressed surprise that there was an issue with the different vesting schedules, as he had committed to in writing on October 19, 2024. Mishra did not accept or implement the parity terms the parties had previously agreed to in writing.

31. On or about August 15, 2025, Plaintiff and Mishra held a Zoom meeting to discuss equity.

32. Following the call, Mishra proposed replacing the 50/50 Agreement with Plaintiff receiving a drastically reduced equity grant of only 5% plus a sales commission model and access to the software. Plaintiff immediately rejected that proposal and reiterated that the parties' agreement was for equal co-ownership.

33. Immediately thereafter, Mishra severed the relationship and froze Plaintiff out of the business. Mishra:

(a) removed Plaintiff's access to all Rhizome AI accounts (including Google Gmail account, working business plans, and the search tool validation database), cutting off shared folders and work product access,

(b) removed Plaintiff's access to the Mercury bank account,

(c) returned limited out-of-pocket expenses totaling approximately $700 (Plaintiff's share of software/server fees and a separate subscription fee paid by Plaintiff's consulting firm), while retaining for himself and Rhizome the full benefits of Plaintiff's development, marketing, subscription revenues, and market-building efforts.

C. Mishra's Continued Exploitation and Securities Fraud

34. After freezing Plaintiff out on August 15, 2025, Mishra and Rhizome have continued to retain and actively exploit the benefits of Plaintiff's services, market access, and business development efforts while refusing to provide Plaintiff with the promised equity, profit participation, or any other compensation whatsoever.

35. Mishra has continued to market and sell Rhizome AI subscriptions to many of Plaintiff's pharmaceutical industry contacts and to other customers developed through Plaintiff's marketing efforts.

36. Based on filings with the Securities and Exchange Commission, Mishra sold stock to two or more investors since December 2025.

37. Upon information and belief, Mishra was accepted into the Winter 2026 Y-Combinator cohort, which includes a $500,000 investment in exchange for 7% equity.

38. For this acceptance, Mishra would have applied in fall 2025—during the period when he was repudiating the 50/50 Agreement and freezing Plaintiff out of the business.

39. In public announcements and materials, Mishra has represented himself as the sole founder, omitting any mention of Plaintiff's co-founder role and contributions. These deliberate misrepresentation clearly induced investors to contribute significant sums to RAI.

40. Upon information and belief, Rhizome AI's website now indicates that multiple additional international regulatory databases have been added to the search program—databases that Plaintiff identified and prioritized based on his regulatory expertise.

41. Upon information and belief, Mishra recently disclosed that Rhizome AI has 20+ customers, substantially all of whom are likely based on Plaintiff's pharmaceutical industry contacts and marketing efforts. (Reported on Rhizome AI Website: https://rhizomeai.com/)

42. Defendants have misappropriated Plaintiff's trade secret and confidential information under false pretenses, including but not limited to Plaintiff's customer contacts, technical know-how, and his regulatory consulting and industry contacts and network.

43. Plaintiff has been damaged by, among other things, the loss of his agreed equity interest, loss of profits and business opportunities, and the misappropriation of his trade secret and confidential information.

**COUNT ONE**
(Declaratory Judgment)

44. Plaintiff repeats the allegations of the preceding paragraphs as if set forth herein at length.

45. The purpose of the Declaratory Judgments Act is to "settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations, and [the Declaratory Judgments Act] is to be liberally construed and administered." 42 Pa. C.S. § 7541(a).

46. An action brought under the Declaratory Judgments Act "must allege an interest by the party seeking relief which is direct, substantial and present, . . . and must demonstrate the existence of an actual controversy related to the invasion or threatened invasion of one's legal rights.'" *Bowen v. Mount Joy Twp.*, 644 A.2d 818, 821 (Pa. Cmwlth.) (quoting Pa. *Institutional*

*Health Servs., Inc. v. Dep't of Corr.*, 631 A.2d 767, 771 (Pa. Cmwlth.), aff'd, 640 A.2d 413 (Pa. 1994)), appeal denied, 652 A.2d 1326 (Pa. 1994).

47. In the matter *sub judice*, the Plaintiff has a direct, substantial and present interest in fifty percent (50%) of the common stock of Rhizome.

48. Defendants have refused to issue the Plaintiff's shares, despite their written agreement; and his substantial sweat equity contribution, including trade secret and confidential information.

49. Defendants' actions demonstrate the existence of an actual controversy, related to the taking of Plaintiff's property interests.

50. Plaintiff therefore seeks an adjudication of the actual controversy concerning the ownership of Plaintiff's shares.

*Wherefore,* Plaintiff seeks a declaratory judgment that he owns 50% of the outstanding and issued common stock of Rhizome and awarding Plaintiff attorney fees, costs of suit and such other relief as the Court deems just and proper.

**COUNT II**
(Specific Performance)

51. Plaintiff repeats the allegations of the preceding paragraphs as if set forth herein at length.

52. "Specific performance generally is described as the surrender of a thing in itself, because that thing is unique and thus incapable—by its nature—of duplication." *Oliver v. Ball*, 2016 PA Super 45, 136 A.3d 162, 166. (2014).

53. Here, Plaintiff provided Rhizome and Mishra access to Plaintiff's confidential and trade secret information, including introducing Mishra to over 100 key contacts in the industry, and provided him with an industry contacts database not generally known to the public.

54. Plaintiff further educated Defendants as to regulatory affairs, international and national drug regulations; introduced Mishra to over 100 key contacts in the industry. In engaging with potential customers and subscriber support meetings, Mishra gained knowledge from interactions between Plaintiff and his regulatory contacts regarding specific regulatory challenges they faced.

55. Plaintiff provided such information with the express understanding that he was a 50% owner of the business.

56. After obtaining control of the foregoing trade secret and confidential information, the Defendants reneged and refused to comply with the parties' agreement.

*Wherefore*, Plaintiff seeks judgment for specific performance awarding him 50% of the outstanding and issued common stock of Rhizome and further granting him attorney fees, costs of suit, and such other relief as the Court deems just and proper.

## COUNT III
(Breach of Contract)

57. Plaintiff repeats the allegations of the preceding paragraphs as if set forth herein at length.

58. In March 2024, Plaintiff contacted Mishra regarding a proposal to adapt Mishra's existing "Rhizome AI" concept, which had been developed for medical devices but appeared to have been dormant with respect to Mishra's active marketing and Rhizome's sales history.

59. Plaintiff's objective was to transform the Rhizome concept into a GenAI-driven search tool for drug and biologics regulatory intelligence, based on Plaintiff's professional experience in regulatory consulting and industry network.

60. Mishra represented that the existing Rhizome AI effort had become dormant due to marketing challenges and lack of customers, but that a pivot to the life sciences pharmaceutical market using Plaintiff's concept and contacts could create a viable business opportunity.

61. The parties initially contemplated forming a new company with a new name and equal ownership, but subsequently agreed to retain the existing Rhizome AI corporate structure as a vehicle to achieve the partnership agreement, while repositioning the business to target the pharmaceutical market using Plaintiff's professional contacts, thereby agreeing to an equal 50/50 ownership.

62. On or about April 6, 2024, Mishra confirmed in writing that he and Plaintiff would own the new business 50/50 with profits to be split equally. Mishra in fact wrote: "Revenue flows to an S-corp, we own it 50/50. We split the profits 50/50." See Ex. A.

63. Pursuant to the parties' contractual agreement, Plaintiff performed substantial co-development and marketing services for more than five months.

64. In fact, in reliance on the agreement entered into by Plaintiff and Defendants, Plaintiff spent hundreds of hours developing the Rhizome AI to adapt it to the pharmaceutical market.

66. From May 2024 through August 2025, Plaintiff's efforts included:

> *(a) Product Co-Development and Algorithm Refinement.* Beginning in July 2024, Plaintiff extensively tested the Rhizome AI search tool using common regulatory questions based on his regulatory expertise. From July through September 2024, Plaintiff made hundreds of search requests and systematically reported correct and incorrect responses to Mishra, who then revised the search algorithm to provide accurate results. This effort continued into 2025. The search tool's accuracy and relevance to regulatory queries depended directly on Plaintiff's domain expertise and iterative testing.

*(b) Development of Validation Database.* Plaintiff also contributed to the development of a Rhizome AI validation database with tested query responses and a scoring system to measure search performance, accuracy, and relevance.

*(c)Regulatory Expertise and Industry Education.* Mishra lacked background in drug regulatory affairs and knowledge about international regulatory authorities' expectations for drug delivery device testing, agency interactions, and submission content. Plaintiff educated Mishra extensively on drug regulations, current industry challenges, and regulatory precedents that would be of interest in searches for FDA and European Medicines Agency (EMA) drug approval decisions. Plaintiff also identified and prioritized additional international regulatory databases for Rhizome AI to download and integrate.

*(d) Marketing Materials and Customer Support.* In October 2024, Plaintiff developed a product brochure explaining the Rhizome AI search tool and its benefits. Plaintiff also developed a comprehensive User's Guide, with frequent updates over the subsequent months in 2025, to help customers conduct successful searches.

*(e)Industry Demonstrations and Commercial Launch.* In October 2024, the parties attended the AFDO/RAPS Combination Product Summit, a major industry meeting, where they demonstrated the tool over two days to several of Plaintiff's regulatory contacts. This generated strong commercial interest and multiple follow-up demonstrations. This event validated the market opportunity and launched the Early Access Program

*(f) Sales and Business Development.* From December 2024 through July 2025, Plaintiff conducted well over 100 demonstration meetings with pharmaceutical industry regulatory contacts to present the search program. Mishra and Plaintiff participated in almost all demo meetings to explain the tool's value. Plaintiff reached out to more than 100 industry contacts during this time via email and LinkedIn messages, with Mishra routinely copied on this correspondence. Essentially all of Rhizome AI's late-2024 and 2025 sales and income originated from Plaintiff's contacts and outreach efforts.

*(g) Professional Marketing and Thought Leadership.* To market the Rhizome AI tool, Plaintiff was interviewed in a pharmaceutical industry podcast ("Let's Combinate") in January 2025; was invited to speak about Rhizome AI at a RAPS Chapter meeting in February 2025; reached out to a conference organizer and was invited to speak about Rhizome AI at the PharmaEd Combination Product Summit in April 2025; and organized a seminar about Rhizome AI through Life Sciences PA in July 2025. Plaintiff was the speaker and was listed as Rhizome AI Co-Founder. These presentations were advertised to over 15,000 individuals, generating significant market exposure. Plaintiff was listed as a Rhizome AI cofounder in these presentations.

*(h)* From February through June 2025, Plaintiff prepared 15 regulatory example questions and responses and published them as LinkedIn posts to the regulatory community, generating over 6,000 reads. hese posts of highly relevant regulatory reference articles were posted on the Rhizome AI website and continue to be

posted, benefiting Rhizome AI's ongoing marketing efforts. (See https://rhizomeai.com/articles )

67. Plaintiff co-developed the product's functionality, created essential marketing and customer materials, educated Mishra on the pharmaceutical regulatory market, leveraged his professional network and reputation to build market presence, and generated substantially all of Rhizome's early customer base and revenue.

68. Plaintiff relied on the parties' agreement and Mishra's written assurances of equal co-ownership and equity parity when he undertook the foregoing efforts and therefore devoted substantial time, expertise, and resources—estimated at over 500 hours—to co-developing and marketing the product without separate compensation. Plaintiff's standard consulting fees are billed at $500.00 per hour.

69. Defendants lacked knowledge, information, or access to Plaintiff's customers or his regulatory consulting and industry network. In fact, Plaintiff's client relationships and industry knowledge were confidential in nature and constituted a "trade secret," which were disclosed only when the parties reached an agreement that he would be a 50/50 partner in Rhizome.

70. Consistent with the parties' agreement, on October 19, 2024, Mishra again confirmed that: "Happy to do a 50/50 split here between us" and "We'll cancel and re-issue my equity starting on the same date and subject to the same terms" as Plaintiff's equity, to ensure matching vesting schedules. See Ex. A.

71. As part and parcel of their agreement, Mishra agreed that Plaintiff would receive 10,000,000 shares under founder equity documentation intended to provide parity with Mishra's own founder shares.

72. In November of 2024, Mishra presented Plaintiff with a Restricted Stock Purchase Agreement (the "SPA") for 10,000,000. However, SPA failed to include critical and agreed-upon terms—referencing matching vesting commencement dates.

73. In mid-2025, after the parties had reached an agreement and Plaintiff had performed more than a year of substantial services, Mishra began asserting that the equity split should change.

74. Mishra communicated an intent not to align his own vesting schedule with Plaintiff's vesting schedule, despite his earlier written commitment on October 19, 2024 to "cancel and re-issue" his equity to match Plaintiff's terms.

75. In July 2025, Mishra reached out to Plaintiff via emails and telephone calls to discuss reducing Plaintiff's equity proportion. Mishra suggested that Plaintiff's sales and marketing efforts were insufficient to justify equal ownership, a characterization Plaintiff disputed as factually inaccurate and made in bad faith.

76. On or about August 4, 2025, Plaintiff provided Mishra with an edited founder equity agreement consistent with the parties agreement—including parity as to the parties vesting schedule.

77. Mishra expressed surprise that there was an issue with the different vesting schedules, as he had committed to in writing on October 19, 2024. Mishra did not accept or implement the parity terms the parties had previously agreed to in writing.

78. On or about August 15, 2025, Plaintiff and Mishra held a Zoom meeting to discuss equity.

79. Following the call, Mishra proposed replacing the 50/50 Agreement with Plaintiff receiving a drastically reduced equity grant of only 5% plus a sales commission model and access

to the software. Plaintiff immediately rejected that proposal and reiterated that the parties' agreement was for equal co-ownership.

80. Immediately thereafter, Mishra severed the relationship and froze Plaintiff out of the business. Mishra:

> (a) removed Plaintiff's access to all Rhizome AI accounts (including Google Gmail account, working business plans, and the search tool validation database) cutting off shared folders and work product access,
>
> (b) removed Plaintiff's access to the Mercury bank account,
>
> (c) retaining for himself and Rhizome the full benefits of Plaintiff's development, marketing, subscription revenues, and market-building efforts; as well as Plaintiff's trade secret and confidential information.

81. Defendants' actions reflect that they never had any intention of complying with the terms of the agreement negotiated with the Plaintiff.

82. The Defendants' actions constitute a breach of the parties' agreement.

82. As a result, Plaintiff has been damaged.

*Wherefore*, Plaintiff seeks judgment against the Defendant for breach of contract, damages, costs of suit, and such other relief as the Court deems just and proper.

**COUNT IV**

(Fraud)

83. Plaintiff repeats the allegations of the preceding paragraphs as if set forth herein at length.

84. In March 2024, Plaintiff contacted Mishra regarding a proposal to adapt Mishra's existing "Rhizome AI" concept, which had been developed for medical devices but appeared to no longer be actively marketed.

85. Plaintiff's objective was to transform the Rhizome concept into a GenAI-driven search tool for drug and biologics regulatory intelligence, based on Plaintiff's professional experience in regulatory consulting and industry network.

86. Mishra represented that the existing Rhizome AI effort had become dormant due to marketing challenges and lack of customers, but that a pivot to the life sciences pharmaceutical market using Plaintiff's concept and contacts could create a viable business opportunity.

87. The parties initially contemplated forming a new company with a new name and equal ownership, but subsequently agreed to retain the existing Rhizome AI corporate structure while repositioning the business to target the pharmaceutical market using Plaintiff's professional contacts, thereby agreeing to an equal 50/50 ownership.

88. On or about April 6, 2024, Mishra confirmed in writing that he and Plaintiff would own the new business 50/50 with profits to be split equally. Mishra in fact wrote: "Revenue flows to an S-corp, we own it 50/50. We split the profits 50/50."

89. Pursuant to the parties' contractual agreement, Plaintiff performed substantial co-development and marketing services for more than five months before officially launching the search tool.

90. In fact, in reliance on the agreement entered into by Plaintiff and Defendants, Plaintiff spent hundreds of hours developing the Rhizome AI search tool to adapt it to the pharmaceutical market, including use of drug delivery terminology, regulatory requirements and expectations, and topics of highest interest to the target market.

91. From May 2024 through August 2025, Plaintiff's efforts included:

> *(a) Product Co-Development and Algorithm Refinement.* Beginning in July 2024, Plaintiff extensively tested the Rhizome AI search tool using common regulatory

questions based on his regulatory expertise. From July through September 2024, Plaintiff made hundreds of search requests and systematically reported correct and incorrect responses to Mishra, who then revised the search algorithm to provide accurate results. This effort continued into 2025. The search tool's accuracy and relevance to regulatory queries depended directly on Plaintiff's domain expertise and iterative testing

*(b) Development of Validation Database.* Plaintiff also contributed to the development of a Rhizome AI validation database with tested query responses and a scoring system to measure search performance, accuracy, and relevance.

*(c)Regulatory Expertise and Industry Education.* Mishra lacked background in drug regulatory affairs and knowledge about international regulatory authorities' expectations for drug delivery device testing, agency interactions, and submission content. Plaintiff educated Mishra extensively on drug regulations, current industry challenges, and regulatory precedents that would be of interest in searches for FDA and European Medicines Agency (EMA) drug approval decisions. Plaintiff also identified and prioritized additional international regulatory databases for Rhizome AI to download and integrate.

*(d) Marketing Materials and Customer Support.* In October 2024, Plaintiff developed a product brochure explaining the Rhizome AI search tool and its benefits. Plaintiff also developed a comprehensive User's Guide, with frequent updates over the subsequent months in 2025, to help customers conduct successful searches.

*(e)Industry Demonstrations and Commercial Launch.* In October 2024, the parties attended the AFDO/RAPS Combination Product Summit, a major industry meeting, where they demonstrated the tool over two days to several of Plaintiff's regulatory contacts. This generated strong commercial interest and multiple follow-up demonstrations. This event validated the market opportunity and launched the Early Access Program (EAP).

*(f) Sales and Business Development.* From December 2024 through July 2025, Plaintiff conducted well over 100 demonstration meetings with pharmaceutical industry regulatory contacts to present the search program. Mishra and Plaintiff participated in almost all demo meetings to explain the tool's value in conducting precedent research in FDA's approved drug databases. Plaintiff reached out to more than 100 industry contacts during this time via email and LinkedIn messages, with Mishra routinely copied on this correspondence. Essentially all of Rhizome AI's late-2024 and 2025 sales and income originated from Plaintiff's contacts and outreach efforts.

*(g) Professional Marketing and Thought Leadership.* To market the Rhizome AI tool, Plaintiff was interviewed in a pharmaceutical industry podcast ("Let's Combinate") in January 2025; was invited to speak about Rhizome AI at a RAPS Chapter meeting in February 2025; reached out to a conference organizer and was invited to speak about Rhizome AI at the PharmaEd Combination Product Summit in April 2025; and organized a seminar about Rhizome AI through Life Sciences PA in July 2025. Plaintiff was the speaker and was listed as Rhizome AI Co-

Founder. These presentations were advertised to over 15,000 individuals, generating significant market exposure.

*(h)* From February through June 2025, Plaintiff prepared 15 regulatory example questions and responses and published them as LinkedIn posts to the regulatory community, generating over 6,000 reads. These posts of highly relevant regulatory reference articles were posted on the Rhizome AI website and continue to be posted, benefiting Rhizome AI's ongoing marketing efforts. (See https://rhizomeai.com/articles ).

92. Plaintiff co-developed the product's functionality, created essential marketing and customer materials, educated Mishra on the pharmaceutical regulatory market, leveraged his professional network and reputation to build market presence, and generated substantially all of Rhizome's early customer base and revenue.

93. Plaintiff justify relied on the parties' agreement and Mishra's written assurances and representations of equal co-ownership and equity parity when he undertook the foregoing efforts and therefore devoted substantial time, expertise, and resources—estimated at over 500 hours—to co-developing and marketing the product without separate compensation. Plaintiff's standard consulting fees are billed at $500.00 per hour.

94. Defendants lacked knowledge, information, or access to Plaintiff's customers or his regulatory consulting and industry network. In fact, Plaintiff's client relationships and industry knowledge were confidential in nature and constituted "trade secrets" which were disclosed only when the parties reached an agreement that he would be a 50/50 partner in Rhizome.

95. Consistent with the parties' agreement, on October 19, 2024, Mishra again confirmed that: "Happy to do a 50/50 split here between us" and "We'll cancel and re-issue my equity starting on the same date and subject to the same terms" as Plaintiff's equity, to ensure matching vesting schedules.

96. As part and parcel of their agreement, Mishra agreed that Plaintiff would receive 10,000,000 shares under founder equity documentation intended to provide parity with Mishra's

own founder shares. These shares and interest in Rhizome AI were intended to serve as a vehicle to achieve a 50-50 partnership rather than to start a new company.

97. In November of 2024, Mishra presented Plaintiff with a Restricted Stock Purchase Agreement (the "SPA") for 10,000,000. However, SPA failed to include critical and agreed-upon terms—referencing matching vesting commencement dates.

98. In mid-2025, after the parties had reached an agreement and Plaintiff had performed more than a year of substantial services, Mishra began asserting that the equity split should change.

99. Defendant's subsequently reneged on every representation that had made to the Plaintiff.

100. In fact, when Plaintiff insisted on compliance with the agreement between the parties, Defendants severed the relationship and froze Plaintiff out of the business. Defendants in fact:

> (a) removed Plaintiff's access to all Rhizome AI accounts (including Google Gmail account, working business plans, and the search tool validation database) cutting off shared folders and work product access),
>
> (b) removed Plaintiff's access to the Mercury bank account,
>
> (c) retaining for himself and Rhizome the full benefits of Plaintiff's development, marketing, subscription revenues, and market-building efforts; as well as Plaintiff's trade secret and confidential information.

101. Defendants' actions reflect that they never had any intention of complying with the terms of the agreement negotiated with the Plaintiff, which Plaintiff justifiably relied upon to his detriment.

102. The Defendant's actions were designed to defraud the Plaintiff into performing substantial services without compensation or an equity stake in the enterprise.

103. Plaintiff has therefore been damaged.

*Wherefore*, Plaintiff seeks judgment against the Defendant for fraud in the inducement, damages, costs of suit, and such other relief as the Court deems just and proper.

**COUNT V**
(10b5 Securities Fraud)

104. Plaintiff repeats the allegations of the preceding paragraphs as if set forth herein at length.

105. The SEC promulgated Rule 10b-5 under Section 10(b) of the Exchange Act, which authorizes the SEC to regulate securities fraud.

106. The text of the regulation, formally 17 CFR § 240.10b-5, states that:

> "it shall be unlawful for any person . . . (a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact . . . or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

107. Courts have repeatedly interpreted Rule 10b-5 to create a private civil cause of action. Rule 10b-5 applies to both public offerings and private placements.

108. For a private plaintiff or the SEC to prove a violation of Rule 10b-5, they must prove the following <u>elements</u>:

- The individual misrepresented a <u>material</u> fact. In *Virginia Bankshares v. Sandberg, 501 U.S. 1083 (1991)*, the Supreme Court found knowingly false statements of reason or opinion to be actionable even though they were conclusory in form.
- The individual did so <u>knowingly</u>, i.e. <u>scienter</u>.

109. In electing to invest in Rhizome, Plaintiff relied upon the express representations contained in the emails and Agreements provided to him by Defendants, to wit that he would own 50% of Rhizome.

110. As soon as the Defendants obtained access to Plaintiff's (i) confidential and trade secret information, including client information, contact information, (ii) expertise concerning, international and national drug regulations; and an (iii) introduction to over 100 key contacts in the industry, and (iv) information concerning data bases not generally known to the public they refused to provide Plaintiff his shares in Rhizome.

111. Defendants have further misled third parties to invest in RAI based on the foregoing misrepresentations. Defendants consummated their securities fraud through the uses of the wire and mail to accomplish their plan.

112. The foregoing representations were material to the Plaintiff and were authorized to be made by the Defendants with the express intent of misleading the Plaintiff.

113. The Plaintiff, to its detriment, reasonably and expressly relied thereon.

*Wherefore,* Plaintiff seeks judgment against the Defendant for violation of Rule 10b5 and in injunction barring Defendants from selling or issuing further shares, and damages, punitive damages, attorney fees, costs of suit, and such other relief as the Court deems just and proper.

## COUNT VI

(Misappropriation of Trade Secret & Confidential Information)

114. Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

115. The Delaware Uniform Trade Secret Act ("DUTSA") recites, in relevant part that, "this chapter displaces conflicting tort, restitutionary and other law of this State providing civil remedies for misappropriation of a trade secret." 6 Del. C. § 2007(a).

116. "[DUTSA] Section 2007 was intended to preserve a single tort cause of action under state law for misappropriation as defined in 6 Del. C. § 2001(2) and thus to eliminate other

tort causes of action founded on allegations of trade secret misappropriation." *Ethypharm S.A. France v. Bentley Pharms., Inc*., 388 F. Supp. 2d 426, 433 (D. Del. 2005).

117. By and through their acts set forth above, the Defendants have misappropriated knowledge, information and access to Plaintiff's customers and information concerning the pharmaceutical industry that were confidential in nature and constituted a "trade secret".

118. Such information was disclosed to the Defendants only when the parties reached an agreement that Plaintiff would be a 50/50 partner in Rhizome.

*Wherefore,* Plaintiff prays for judgment against the Defendants for violating DUSTA and seeks damages, punitive damages, attorney fees, costs of suit and injunctive relief as follows:

(a) enjoining Defendants from copying, disclosing or damaging any electronically stored data or information, provided to them by the Plaintiff, including, but not limited to:

i. information concerning Plaintiff's customers, assets, database, operations, technology including, without limitation, any and all technical and nontechnical information;

ii. Plaintiff's proprietary information;

iii. ideas, schematics, concepts, work in process, technology, models, inventions, material data, business methods, business policies, research and/or development, drawings, know-how, processes, apparatus, equipment, algorithms, software programs, source code, object code, software source documents, and formulae related to the current, future and proposed products and services of Rhizome which were derived from the Plaintiffs trade secrets and confidential information.

**COUNT VII**
(Detrimental Reliance)

119. Plaintiff repeats the allegations of the preceding paragraphs as if set forth herein at length.

120. In March 2024, Plaintiff contacted Mishra regarding a proposal to adapt Mishra's existing "Rhizome AI" concept, which had been developed for medical devices but appeared no longer to be actively marketed.

121. Plaintiff's objective was to transform the Rhizome concept into a GenAI-driven search tool for drug and biologics regulatory intelligence, based on Plaintiff's professional experience in regulatory consulting and industry network.

122. Mishra represented that the existing Rhizome AI effort had become dormant due to marketing challenges and lack of customers, but that a pivot to the life sciences pharmaceutical market using Plaintiff's concept and contacts could create a viable business opportunity.

123. The parties initially contemplated forming a new company with a new name and equal ownership, but subsequently agreed to retain the existing Rhizome AI corporate structure while repositioning the business to target the pharmaceutical market using Plaintiff's professional contacts, thereby agreeing to an equal 50/50 ownership.

124. On or about April 6, 2024, Mishra confirmed in writing that he and Plaintiff would own the new business 50/50 with profits to be split equally. Mishra, in fact, wrote: "Revenue flows to an S-corp, we own it 50/50. We split the profits 50/50."

125. Pursuant to the parties' contractual agreement, Plaintiff performed substantial co-development and marketing services for more than five months prior to the official launch of the product, and thereafter until August 2025.

126. In fact, in reliance on the agreement entered into by Plaintiff and Defendants, Plaintiff spent hundreds of hours developing the Rhizome AI to adapt it to the pharmaceutical market.

127. From May 2024 through August 2025, Plaintiff's efforts included:

*(a) Product Co-Development and Algorithm Refinement.* Beginning in July 2024, Plaintiff extensively tested the Rhizome AI search tool using common regulatory questions based on his regulatory expertise. From July through September 2024, Plaintiff made hundreds of search requests and systematically reported correct and incorrect responses to Mishra, who then revised the search algorithm to provide accurate results. This effort continued into 2025. The search tool's accuracy and relevance to regulatory queries depended directly on Plaintiff's domain expertise and iterative testing.

*(b) Development of Validation Database.* Plaintiff also contributed to the development of a Rhizome AI validation database with correct query responses and a scoring system to measure search performance, accuracy, and relevance.

*(c)Regulatory Expertise and Industry Education.* Mishra lacked background in drug regulatory affairs and knowledge about international regulatory authorities' expectations for drug delivery device testing, agency interactions, and submission content. Plaintiff educated Mishra extensively on drug regulations, current industry challenges, and regulatory precedents that would be of interest in searches for FDA and European Medicines Agency (EMA) drug approval decisions. Plaintiff also identified and prioritized additional international regulatory databases for Rhizome AI to download and integrate.

*(d) Marketing Materials and Customer Support.* In October 2024, Plaintiff developed a product brochure explaining the Rhizome AI search tool and its benefits. Plaintiff also developed a comprehensive User's Guide, with frequent updates over the subsequent months in 2025, to help customers conduct successful searches.

*(e)Industry Demonstrations and Commercial Launch.* In October 2024, the parties attended the AFDO/RAPS Combination Product Summit, a major industry meeting, where they demonstrated the tool over two days to several of Plaintiff's regulatory contacts. This generated strong commercial interest and multiple follow-up demonstrations. This event validated the market opportunity and launched the Early Access Program (EAP).

*(f) Sales and Business Development.* From December 2024 through July 2025, Plaintiff conducted well over 100 demonstration meetings with pharmaceutical industry regulatory contacts to present the search program. Mishra and Plaintiff participated in almost all demo meetings to explain the tool's value in conducting precedent research in FDA's approved drug databases. Plaintiff reached out to more than 100 industry contacts during this time via email and LinkedIn messages, with Mishra routinely copied on this correspondence. Essentially all of Rhizome AI's late-2024 and 2025 sales and income originated from Plaintiff's contacts and outreach efforts.

*(g) Professional Marketing and Thought Leadership.* To market the Rhizome AI tool, Plaintiff was interviewed in a pharmaceutical industry podcast ("Let's

Combinate") in January 2025; was invited to speak about Rhizome AI at a RAPS Chapter meeting in February 2025; reached out to a conference organizer and was invited to speak about Rhizome AI at the PharmaEd Combination Product Summit in April 2025; and organized a seminar about Rhizome AI through Life Sciences PA in July 2025. Plaintiff was the speaker and was listed as Rhizome AI Co-Founder. These presentations were advertised to over 15,000 individuals, generating significant market exposure.

*(h)* From February through June 2025, Plaintiff prepared 15 regulatory example questions and responses and published them as LinkedIn posts to the regulatory community, generating over 6,000 reads. These posts of highly relevant regulatory reference articles were posted on the Rhizome AI website and continue to be posted, benefiting Rhizome AI's ongoing marketing efforts. (See https://rhizomeai.com/articles)

128. Plaintiff co-developed the product's functionality, created essential marketing and customer materials, educated Mishra on the pharmaceutical regulatory market, leveraged his professional network and reputation to build market presence, and generated substantially all of Rhizome's early customer base and revenue. Rhizome would not exist today as a life sciences program search tool had the Plaintiff not reached out to Mishra with the business concept and offer to co-develop the product.

129. Plaintiff justifiably relied on the Defendants' specific representations to his detriment.

*Wherefore,* Plaintiff seeks judgment against the Defendant for detrimental reliance, damages, punitive damages, attorney fees, costs of suit, and such other relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

Plaintiff demands a jury trial.

Respectfully submitted.

/s/ Thomas S. Harty, Esq.

Thomas S. Harty, Esq. (49987)
Lauletta Birnbaum
123 S. Broad Street
Suite 2140
Philadelphia Pennsylvania 19103